IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAYMOND A. FERKI, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 10-2756 |
| | : | |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as successor in interest to Wachovia Bank, N.A.; WELLS FARGO & COMPANY, INC., as successor in interest to Wachovia Corporation, and THE BANK OF NEW YORK MELLON CORPORATION and MELLON INVESTOR SERVICES, LLC d/b/a BNY Mellon Shareholder Services, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                                                                                                  December 20, 2010

Presently before the Court is the Motion of Defendants Wells Fargo Bank, N.A., Wells Fargo & Company, Inc., The Bank of New York Mellon Corporation, and Mellon Investor Services, LLC's to Dismiss the Complaint of Plaintiff Raymond A. Ferki pursuant to Federal Rules of Civil Procedure 12(b)(6). For the following reasons, the Motion is granted in part and denied in part.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Raymond A. Ferki, a resident of Richboro, Pennsylvania, is a long-time employee of the United Parcel Service, Inc. ("UPS"). (Am. Compl. ¶¶ 3, 12.) Throughout Plaintiff Ferki's employment with UPS, he accumulated "substantial shares" of UPS Class A

Common Stock via UPS's Incentive Compensation Plan ("Stock Plan") – a program through which UPS employees may purchase company stock. (Id. ¶ 13.) Defendant The Bank of New York Mellon Corporation ("BNYM"), "as stock transfer and registrar for the Stock Plan," held Plaintiff's UPS shares "in a fiduciary capacity as custodian and trustee." (Id. ¶ 15.) Plaintiff avers that he "intended to keep the stock to support him and his family in retirement," and that he expected to receive dividend payments and future incentive payments from UPS. (Id. ¶ 14.)

Wachovia Bank, N.A. ("Wachovia") offers a program through which UPS employees can obtain lines of credit using their UPS stock as security.[1] (Id. ¶ 16.) In June of 2005, Plaintiff pledged 3,283 shares of his UPS stock to secure a $130,000 line of credit with Wachovia. (Id. ¶¶ 16, 22, Ex. B ("Wachovia Bank, N.A. Stock Equity Line Agreement and Disclosure Statement").) On June 15, 2005, Wachovia presented Plaintiff with a form agreement ("Stock Line Agreement") prepared by Wachovia and commonly used by the company for transactions of this kind. (Id. ¶ 17.) The Stock Line Agreement provided that, if a drop in UPS stock prices caused the balance of Plaintiff's line of credit to be more than 80% of the value of his UPS stock (referred to as the "Trigger LTV" in the Stock Line Agreement),

> [Plaintiff] must elect within six (6) days of the date of written notice sent by [Wachovia] (the "Notice Period") to do one or more of the following to reduce the Outstanding Balance to 60% of the Fair Market Value of the Securities: (i) pledge additional Securities; (ii) pay a portion of the Outstanding Balance; (iii) agree to a reduction in the potential maximum amount of the Outstanding Balance, through a reduction in the Credit Limit applicable to [Plaintiff's] Account; or (iv) liquidate all or part of [Plaintiff's UPS stock] as necessary to pay the Outstanding Balance, apply the proceeds of such

---

[1] Defendant Wells Fargo Bank, N.A., ("Wells Fargo") is sued as successor in interest to Wachovia Bank, N.A. (Id. ¶ 3.) Wells Fargo is a national banking institution with a principal place of business in South Dakota. (Id.) Defendant Wells Fargo & Co., Inc. ("Wells Parent") is the parent of Wells Fargo, and is sued as successor in interest to Wachovia Corporation. (Id. ¶ 4.)

liquidation to the Outstanding Balance, and close [Plaintiff's] Account.

(Id. ¶ 24.) If Plaintiff did not "elect one, or a combination of several, of these options" within the six-day notice period, the Agreement stated that Wachovia would liquidate Plaintiff's stock as necessary to pay the outstanding balance and close Plaintiff's account. (Id. ¶ 24.) According to the Agreement, the notice period began to run when Wachovia placed written notice to Plaintiff Ferki in the mail. (Id. ¶ 25, Ex. B ¶ 19.) Plaintiff signed the Stock Line Agreement without consulting an attorney, and the Agreement went into effect on June 21, 2005. (Id. ¶¶ 19, 20.)

On November 8, 2006, Plaintiff executed a Stock Line Modification Agreement, which increased Plaintiff's credit limit to $155,000. (Id. ¶¶ 26-27.) Pursuant to this agreement, Plaintiff agreed to pledge 466 additional shares of UPS stock, bringing the total number of shares pledged to 3,749. Plaintiff avers that Wachovia never requested, nor did Plaintiff execute, any hypothecation form to effectuate the pledge of Plaintiff's 3,749 shares of UPS stock. (Id. ¶ 28.)

On May 1, 2009, Plaintiff Ferki received a check from Wachovia in the amount of $16,718.51. (Id. ¶ 31.) According to the Amended Complaint, Plaintiff had not received notice, oral or written, from Wachovia, Defendant Wells Fargo, or Defendant Wells Parent of a Trigger LTV requiring him to take action to preserve his stock. (Id. ¶ 30.) When Plaintiff contacted Wachovia to inquire as to why he had received the check, he learned that Wachovia had liquidated his stock on March 17, 2009 – six weeks before he received the check. (Id. ¶ 32.) Wachovia claimed that it had sent Plaintiff a letter on February 10, 2009 notifying him of the Trigger LTV and advising Plaintiff that he had six business days to elect one of the four options listed in the Stock Line Agreement to cure this deficiency. (Id.) Wachovia subsequently provided Plaintiff with the copy of the purported February 10, 2009 letter (see Exhibit D), but

Plaintiff alleges that the letter was neither signed, nor did it indicate how or when it was transmitted. (Id. ¶ 33.) Plaintiff avers, upon information and belief, that Defendants either failed to mail the letter, or, if they did, that Plaintiff did not receive the letter before the liquidation. (Id. ¶ 35.)

According to Plaintiff, had Wachovia or the aforementioned Defendants notified Plaintiff of the alleged deficiency in February 2009, Plaintiff "would have elected to cure the situation by one of the other three options, and would not have consented to the liquidation of his shares in UPS stock." (Id. ¶ 39.) Plaintiff further alleges that this failure to provide notice represents a breach of the Stock Line Agreement by Wachovia, Wells Fargo, and Wells Parent. (Id. ¶ 40.) Similarly, Plaintiff claims that Defendant BNYM "breached its legal and fiduciary obligations to [Plaintiff] as custodian of his stock by allowing Wachovia's unauthorized liquidation of [Plaintiff's] UPS shares" under inappropriate circumstances. (Id. ¶ 41.)

In addition, Plaintiff alleges that Wachovia liquidated Plaintiff's stock at less than its true market value. (Id. ¶ 43.) According to Plaintiff, "Wachovia sold [Plaintiff's] stock on March 17, 2009, at a price of $42.982 per share, for a total of $161.177.56." (Id.) Had Wachovia sold Plaintiff's stock at the market close price of $46.240 per share on March 17, 2009, Plaintiff avers that Wachovia would have obtained $173,394.68 – $12,217.12 more than the company actually received. (Id.) Moreover, Plaintiff avers that UPS "continued to climb in value after Wachovia liquidated it." (Id. ¶ 44.) On May 1, 2009, when Plaintiff received the liquidation proceeds, UPS stock allegedly closed at $51.660 per share. According to Plaintiff, this "would have made his shares more than $32,000 more than the actual liquidation price." (Id.)

As a result of the alleged unauthorized liquidation and transfer of Plaintiff's stock,

4

Plaintiff suffered "the loss of his stock and its value. . . . future incentive payment from UPS, which through age 60 would have equaled $90,000, and future additional dividends, which through age 60 would have eqauled $95,000." (Id. ¶ 45.)  Consequently, Plaintiff alleges that Defendants have "deprived [Plaintiff] of a substantial portion of his retirement nest egg and a substantial portion of the value of his years of labor for UPS, his employer." (Id. ¶ 45.) According to Plaintiff, Defendants' actions "demonstrated reckless indifference for the rights and interest of [Plaintiff], and were commercially unreasonable." (Id. ¶ 46.)  Plaintiff alleges that he has asked Defendants to compensate for their breaches, but they have refused to do so. (Id. ¶ 47.)

Plaintiff commenced this action in the Philadelphia Court of Common Pleas in May of 2010 against Defendants Wells Fargo Bank, N.A., as successor in interest to Wachovia Bank, N.A.; Wells Fargo & Company, Inc., as successor in interest to Wachovia Corporation; The Bank of New York Mellon Corporation; and Mellon Investor Services ("MIS").  Defendants filed a Notice of Removal to federal court on June 8, 2010, and subsequently filed a Motion to Dismiss Plaintiff's Complaint on June 21, 2010.  Plaintiff filed an Amended Complaint on July 7, 2010, which Defendants then moved to dismiss on July 21, 2010.  Plaintiff filed a Response in Opposition to Defendants' Motion on August 9, 2010, and Defendants filed a Reply on August 24, 2010.

In the Amended Complaint, Plaintiff alleges (1) breach of contract against all Defendants (id. ¶¶ 48-54); (2) conversion against all Defendants (id. ¶¶ 55-61); (3) civil conspiracy against all Defendants (id. ¶¶ 62-72); (4) breach of common law fiduciary duties against all Defendants (id. ¶¶ 73-77); (5) state law unfair trade practices against Defendants Wells Fargo and Wells Parent (id. ¶¶ 78-81); (6) tortious interference with a prospective economic relationship against

all Defendants (id. ¶¶ 82-98); (7) rescission against Defendants Wells Fargo and Wells Parent (id. ¶¶ 99-104); (8) liability under Article VIII of the Uniform Commercial Code against Defendants BNYM and MIS (id. ¶¶ 105-09); and (9) liability under Article IX of the Uniform Commercial Code against Defendants Wells Fargo and Wells Parent. (Id. ¶¶ 110-15.) Defendants move to dismiss Plaintiff's claims for conspiracy, state unfair trade practices, and tortious interference with a prospective economic relationship pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court now turns to a discussion of this Motion.

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. The Court emphasized that it would not require a "heightened fact pleading of specifics," but only "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In the subsequent case of Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), the Court enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim. First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949. Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure

from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1950. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. The task of determining whether a complaint states a plausible claim for relief is "context-specific," and "requires the reviewing court to draw on its judicial experience and common sense." Id. The Supreme Court explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at 1949 (citing Twombly, 550 U.S. at 556-57); see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (adopting Iqbal's standards).

Notwithstanding the foregoing, many of the fundamental underpinnings of Rule 12(b)(6) still stand. Arner v. PGT Trucking, Inc., No. CIV.A.09-565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); Spence v. Brownsville Area Sch. Dist., No. CIV.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. Jul. 15, 2008). Federal Rule of Civil Procedure 8 requires only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. FED. R. CIV. P. 8; Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

7

**III. DISCUSSION**[2]

    **A.**    <u>**Whether Plaintiff has Stated a Claim for Tortious Interference with a Prospective Economic Relationship**</u>

Count VI alleges that Defendants have tortiously interfered with Plaintiff's "future participation in the Stock Plan," which could have included "promotions [or] participation in other company incentive plans." (Am. Compl. ¶ 95.) Plaintiff also alleges that Wachovia has damaged his reputation in the UPS community, causing him to appear unable to manage his own financial affairs and untrustworthy in financial matters. (<u>Id.</u>)

A cause of action for tortious interference with prospective contractual relations[3] requires "(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct;" and (5) "a reasonable likelihood that the relationship would have occurred but for the defendant's interference." <u>Acumed LLC v. Advanced Surgical</u>

---

    [2] Although the parties initially argued under both Pennsylvania and Georgia law, they have since agreed in supplemental briefing that Pennsylvania law applies to the issues at hand. Such a conclusion is consistent with the Court's own independent analysis. Given that the parties agree to the application of Pennsylvania law, and that Pennsylvania appears to have both sufficient contacts to the dispute and an interest in protecting its citizens from unfair trade practices and other economic harm, the Court will apply Pennsylvania law without undergoing a complex choice of law analysis.

    [3] Notably, Defendants argue under a standard for interference with prospective *contractual* relations, while Count VI more broadly alleges tortious interference with a prospective *economic* relationship. Given the inclusion of "economic relationship" within the language of the standard and the lack of challenge by Plaintiff to Defendants' use of this standard, the Court will apply the principles of interference with contractual relations to Plaintiff's claim.

Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009).

According to Plaintiff, Wachovia used its Stock Line Agreement form regularly before the liquidation of Plaintiff's stock, and Defendant BNYM served as Wachovia's transfer agent under the Agreement for a substantial period of time before the liquidation. As such, the companies were aware of the harm such a liquidation could cause an employee-borrower – specifically, interference with the employee's economic relationship with his or her employer (as the issuer of the stock). (Am. Compl. ¶¶ 83, 98.) Despite this knowledge, Wachovia and Defendant BNYM allegedly failed adopt procedures necessary to safeguard the liquidation process, such as verifying that a borrower has actually pledged stock as collateral for a Wachovia loan or that BNYM has authority to effectuate the sale and transfer of the stock. (Id. ¶¶ 64, 66.) Plaintiff characterizes these actions as "more than mere poor business practices." (Id. ¶ 67.) He alleges that Defendants exhibited "willful[] and reckless indifference" to his rights, and asserts that the Court may "infer[] from the nature of Defendants' actions and inaction" a specific "intent to injure or harm [Wachovia and BNYM] customers." (Id. ¶¶ 67, 72.)

The Court finds such allegations sufficient to survive Rule 12(b)(6) review. Defendants respond that Plaintiff has failed to allege a specific intent to injure on the part of Defendants – rather, Plaintiff merely "infers" a general intent to injure based on Defendants' purported poor business practices. (Defs.' Mot. Dismiss 10.) The Court may infer a specific intent to harm, however, "where the actor knows an injury is certain or substantially certain to occur as a result of his action." Spitzer v. Abdelhak, No. CIV.A.98-6475, 1999 WL 1204352, at *10 (E.D. Pa. Dec. 15, 1999) (quoting Total Care Sys., Inc. v. Coons, 860 F. Supp. 236, 241 (E.D. Pa. 1994)); Hydrair Inc. v. Nat'l Env't Balancing Bureau, No. CIV.A.2846, 2001 WL 1855055, at *6 (Pa.

9

Com. Pl. Apr. 23, 2001). Here, Plaintiff has clearly alleged that Defendants knew, via their experience with the liquidation process and regular use of the Stock Line Agreement, that Wachovia's liquidation of Plaintiff's UPS stock would terminate Plaintiff's participation in the UPS Stock Plan. Thus, the Court may properly infer intent to harm on the part of Defendants.

Similarly, the Court rejects Defendants' argument that the Plaintiff cannot allege a specific intent to injure where Defendants merely "act[ed] to cure plaintiff's default under the terms of his line of credit." (Defs.' Mot. Dismiss 10.) Under the applicable law, a court may infer such an intent even from "an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." RESTATEMENT (SECOND) OF TORTS § 766 cmt. j; see also Field v. Philadelphia Elec. Co., 565 A.2d 1170, 1178 (Pa. Super. Ct. 1989) ("[I]ntent extends both to the desired consequences and to the consequences substantially certain to follow from the act."). Regardless of Defendants' primary intent, Plaintiff has alleged that Defendants liquidated Plaintiff's stock with the knowledge that a "necessary consequence" of the act would be the termination of Plaintiff's participation in the Stock Plan.

Moreover, Defendants' conduct – even if they merely acted to cure Plaintiff's default – is not "privileged" within the meaning of the standard for tortious interference. An actor may be privileged to interfere with another's prospective contractual relationship if "(1) the actor has a legally protected interest; (2) he acts or threatens to act to protect the interest; and (3) the threat is to protect it by proper means," Global Payments Direct v. EVS Holding Co., Inc., No. CIV.A.1373, 2005 WL 2100102, at *9 (Pa. Com. Pl. Aug. 29, 2005). Plaintiff has alleged improper conduct by the Defendants in liquidating Plaintiff's stock without his consent. As such,

10

Plaintiff's allegations suggest both intent and lack of privilege sufficient to state a claim for tortious interference. Therefore, the Court declines to dismiss this claim.

B. **Whether Plaintiff has Stated a Claim for Civil Conspiracy**

Count III alleges that Defendants conspired together to unlawfully liquidate and transfer Plaintiff's stock without his authorization. (Am. Compl. ¶ 70.) In order to state a cause of action for civil conspiracy under Pennsylvania law, a complaint must allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Chantilly Farms, Inc. v. W. Pikeland Twp., No. CIV.A.00-3903, 2001 WL 290645, at *13 (E.D. Pa. Mar. 23, 2001) (quoting Smith v. Wagner, 588 A.2d 1308, 1311-12 (Pa. Super. Ct. 1991)). "Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979). The element of malice requires a showing that "the sole purpose of the conspiracy is to cause harm to the party who has been injured." Becker v. Chicago Title Ins. Co., No. CIV.A.03-2292, 2004 WL 228672, at *13 (E.D. Pa. Feb. 4, 2004) (citing Thompson, 412 A.2d at 472).

Defendants contend that Plaintiff has failed to allege "sole intent to injure" on the part of Defendants. (Defs.' Mot. Dismiss 7.) The Court agrees. Similar to Plaintiff's allegations of tortious interference, Plaintiff's conspiracy claim alleges that the "intentional, irresponsible and reckless" business practices in which Defendants engaged despite knowing of the harm an unauthorized liquidation could cause employee-borrowers gives rise to an inference of "an intent to injure or harm their customers." (Am. Compl. ¶ 67.) Plaintiff contends that such allegations

11

are sufficient to state a conspiracy claim because Pennsylvania law does not require that the *sole* intent of the conspirators be to injure Plaintiff. Rather, Plaintiff argues that the intent must be "without justification or privilege, i.e. the absence of an intent by the conspirators to further their own legitimate interest." (Pl.'s Resp. Opp'n Mot. Dismiss 9. ("Pl.'s Resp.")) While Plaintiff declines to pinpoint Defendants' precise intent at this stage of the proceedings, he argues that, because the liquidation of his stock was "undertaken without any legitimate basis," he "is entitled to discovery to prove that [Defendants] acted with malice, another way the intent to injure has been expressed." (Id.)

The Court finds Plaintiff's interpretation of the standard for civil conspiracy to be somewhat misguided. Though it is true that Defendants' conduct must be "without justification," Pennsylvania law dictates that "only conduct intended 'solely to injure' the plaintiff is actionable." Guar. Towers, LLC v. Cellco P'ship, No. CIV.A.07-0554, 2007 WL 2617651, at *6 (M.D. Pa. Sept. 6, 2007) (quoting Thompson, 412 A.2d at 472); see also WM High Yield Fund v. O'Hanlon, No. CIV.A.04-3423, 2005 WL 1017811, at *14 (E.D. Pa. Apr. 29, 2005) (accepting the "sole purpose" requirement and rejecting plaintiffs' contention that a plaintiff may allege malice "by setting forth the actions and inaction taken by the [defendants] without just cause or excuse"). Unlike the standard for tortious interference, which allows the Court to infer intent via Defendants' knowledge that harm would occur, the malice element of conspiracy "requires the higher showing that the motivation behind the conspiracy be to injure the Plaintiff[]." Spitzer, 1999 WL 1204352, at *10.

Here, Plaintiff fails to allege such specific intent. "Merely describing something as malicious is not sufficient to give the proper inference of malice, meaning an intent to injure."

12

Id. at *9. As discussed in the context of the tortious interference claim, Plaintiff's allegations suggest no more than potentially improper business practices with knowledge of consequential harm.[4] Indeed, while arguing that Defendants' liquidation was "without justification," Plaintiff expressly acknowledges that "repayment of [Plaintiff]'s credit line may have benefitted Wells Fargo" and recognizes that "an entire laundry list of potential intents could be identified." (Pl.'s Resp. 9.) Because Plaintiff has failed to allege a sole intent to injure on the part of the defendant, the conspiracy claim fails.

Plaintiff cannot salvage his claim by asserting that Defendants have not "provided any justification" for liquidating *all* of Plaintiff's shares rather than only those necessary to cure the deficiency in Plaintiff's collateral. (Id. at 10.) Similarly, Plaintiff takes issue with Defendants' characterization of the liquidation as an act to cure Plaintiff's "default" as opposed to, as Plaintiff suggests, a temporary collateral deficiency. (Id.) Such distinctions are irrelevant. "A showing that an alleged conspirator acted for professional or business benefit will preclude a finding of malice." Giordano v. Claudio, 714 F. Supp. 2d 508, 534 (E.D. Pa. 2010). Whether Defendants acted to remedy a default or a deficiency, or whether they liquidated some shares or all shares does not change the fact that repayment of Plaintiff's credit line benefitted Defendants. See, e.g., WM High Yield Fund, 2005 WL 1017811, at *13-14 ("The fact that it may have been necessary

---

[4] Plaintiff also argues that Defendants were not justified in liquidating Plaintiff's shares because the shares did not, in fact, fall below the trigger level. (Pl.'s Resp. 10) Because Plaintiff did not include these allegations in the Amended Complaint, however, the Court will not consider them. In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 398 (3d Cir. 2000) (finding that a district court should not consider facts not alleged in the complaint when deciding a motion to dismiss under Rule 12(b)(6)).

13

to deceive Plaintiffs in order to carry out [Defendants'] scheme [to artificially inflate price of securities to fund corporate growth] in no way indicates that they acted with malice solely to injure."); Spitzer, 1999 WL 1204352, at *9 (finding that plaintiffs did not allege malice where the purpose of the conspiracy was to deceive plaintiff to benefit defendant personally and professionally); Guar. Towers, 2007 WL 2617651, at *6 (dismissing conspiracy claim where plaintiff alleged that defendants acted to obtain revenue through the conspiracy and thus did not have the sole intent to injure the plaintiff). Even taking all of Plaintiff's allegations to be true, Plaintiff has not alleged a sole intent to injure on the part of Defendants. Thus, the conspiracy claim fails.

### D.  Whether the Economic Loss Doctrine Applies to Plaintiff's Claim Under the Pennsylvania Unfair Trade Practices and Consumer Protection Law

In Count V, Plaintiff alleges that Defendants Wells Fargo and Wells Parent violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONST. STAT. § 201-1 *et seq*. ("UTPCPL"). The UTPCPL prohibits "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Id. at § 201-2(4)(xxi). According to the Amended Complaint, "[b]y representing that Wachovia would provide written notice to Mr. Ferki of any alleged Trigger LTV and an opportunity to elect a cure for the same, without actually intending to provide same, Wachovia engaged in fraudulent and/or deceptive conduct which was likely to cause, and did cause, Mr. Ferki to believe that he could safely entrust his UPS stock to Wachovia without risk that Wachovia would liquidate his stock without authorization." (Am. Compl. ¶ 80.)

Defendants argue that the Court should apply the economic loss doctrine to bar Plaintiff's

UTPCPL claim. The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995)). The purpose of the doctrine is to "prevent claims based in tort that only allege economic losses from proceeding, in part because those losses can be compensated through contract remedies." De Febo v. Andersen Windows, Inc., No. CIV.A.09-2993, 2009 WL 3150390, at *9 (E.D. Pa. Sept. 24, 2009). While the doctrine initially arose in the products liability context "to prevent tort recovery where the only injury was to the product itself," the Third Circuit has since applied it to service contracts, see, e.g., Palco Linings, Inc. v. Pavex, Inc., 755 F. Supp. 1269, 1272 (M.D. Pa. 1990), negligent misrepresentation claims, see, e.g., Duquesne Light, 66 F.3d at 618, and fraud claims under the UTPCPL, see, e.g., Werwinski, 286 F.3d 661, 671. Sarsfield v. Citimortgage, Inc., 707 F. Supp. 2d 546, 556 (M.D. Pa. 2010).

Defendants assert that Plaintiff's UTPCPL claim is merely a breach of contract claim disguised as one for fraud. (Defs.' Mot. Dismiss 13.) According to Defendants, Wachovia's alleged duty to give notice arose from its agreement with Plaintiff, such that Plaintiff's economic losses stem solely from Defendants' breach of the Stock Line Agreement. (Id.) Defendants also note that Plaintiff's UTPCPL claim is nearly identical to his breach of contract claim, save for Plaintiff's allegation that Defendants acted "fraudulent[ly] and/or deceptive[ly]" in violation of the UTPCPL. (Id.)

In response, Plaintiff contends that he has alleged more than mere economic loss. According to Plaintiff, the "unlawful liquidation and conversion" of Plaintiff's stock "violated

15

[Plaintiff's] property rights in that stock, and the actual physical conversion of [Plaintiff's] stock certificate(s) resulted in direct loss of [Plaintiff's] tangible property." (Pl.'s Resp. 13.) Moreover, Plaintiff argues that he has alleged "injury to person" in the form of reputational harm and "embarrassment and humiliation in the eyes of his employer and his colleagues." (Id.; Am. Compl. ¶¶ 68, 69, 91, 92.)

Plaintiff offers no authority, however, stating that he has a legally protectible property interest in his stock or that such damages constitute anything but purely economic loss. In the products liability context, courts have held that loss is "purely economic" where a product injures only itself, and not any person or other property. Lucker Mfg. v. Milwaukee Steel Foundry, a Div. of Grede Foundries, 777 F. Supp. 413, 415 (E.D. Pa. 1991) (citing East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871 (1986)). Presumably, Plaintiff is suggesting that his stock qualifies as injury to "other property." Under Pennsylvania law, however, stocks or stock certificates are intangible property that are "merely representative or evidence of value." Lucker Mfg., A Unit of Amclyde Engineered Products, Inc. v. Home Ins. Co., 23 F.3d 808, 818 (3d Cir. 1994). In contrast, "tangible property is property that can be felt or touched, or property capable of being possessed or realized." Id. (citing In re Estate of MacFarlane, 459 A.2d 1289, 1291-92 (Pa. Super. Ct. 1983); U.S. Fidelity & Guar. Co. v. Barron Indus., Inc., 809 F. Supp. 355, 360 (M.D. Pa. 1992)). Applying these definitions, the Court finds that Plaintiff has alleged only the loss of present and future value his stock represents. In Pennsylvania, courts consider lost profits "the quintessential economic loss." 2-J Corp. v. Tice, 126 F.3d 539, 542 (3d Cir. 1997).

Likewise, Plaintiff's alleged injuries to his "person" in the form of emotional harm and

damage to his professional reputation do not take his claim outside the ambit of the economic loss doctrine. As Defendants note, emotional harm is not compensable under the UTPCPL. Sarsfield, 707 F. Supp. 2d at 559 (finding that, "because claims for emotional distress are not compensable under the UTPCPL[,] the fact that Plaintiffs have plead them is immaterial and does not salvage their claim" from application of the doctrine) (citing Krisa v. Equitable Life Assurance Soc'y, 113 F. Supp. 2d 694, 706 (M.D. Pa. 2000)). Moreover, courts have agreed that harm to business reputation constitutes economic loss, not injury to person or property. Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc., 28 F. Supp. 2d 947, 951 (E.D. Pa. 1998); Am. & Foreign Ins. Co. v. Phoenix Petroleum Co., No. CIV.A.97-3349, 1998 WL 333965, at *5 (E.D. Pa. June 23, 1998) ("Loss of good will and reputation constitutes economic loss, not property damage."). Thus, these alleged damages are irrelevant to the Court's decision as to whether to apply the doctrine.

Plaintiff next contends that, "even in cases where direct injury to persons or property is absent, the application of the economic loss doctrine to intentional tort claims in general, and claims pursuant to the UTPCPL in particular, remains unsettled." (Pl.'s Resp. 13.) The Pennsylvania Supreme Court has not yet addressed whether a plaintiff can recover for pure economic loss under the UTPCPL. Contrary to Plaintiff's assertions, however, the Pennsylvania Supreme Court has not limited application of the doctrine to a narrow area of tort law. See Bilt-Rite Contractors, Inc. v. The Architectual Studio, 866 A.2d 270 (Pa. 2005). Instead, it has merely "made an exception to the doctrine to allow a commercial plaintiff recourse from an 'expert supplier of information' with whom the plaintiff has no contractual relationship, when the plaintiff has relied on that person's 'special expertise' and the 'supplier negligently

17

misrepresents the information to another in privity.'" Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 177-78 (3d. Cir. 2008) (quoting Bilt-Rite, 866 A.2d at 286); Grimm v. Discover Fin. Servs., No. CIV.A.08-747, 08-832, 2008 WL 4821695, at *13 (W.D. Pa. Nov. 4, 2008). This exception does not apply to the case at bar, as Plaintiff is not a commercial entity and did have a contractual relationship with Wachovia.

Moreover, in Werwinski v. Ford Motor Co., supra, the Third Circuit found the doctrine applicable to a UTPCPL claim for intentional fraud, and predicted the Pennsylvania Supreme Court would do the same.[5] In doing so, the Werwinski panel noted with approval that some courts have excepted fraud-in-the-inducement claims from the economic loss doctrine, but only where the fraud is not interwoven with the breach of contract. Id. at 680-81. See also Samson Lift Techs., LLC v. Jerr-Dan, Corp., No. CIV.A.09-1590, 2010 WL 1052932, at *6 n.5 (M.D. Pa. Mar. 22, 2010) (holding that plaintiff must allege facts showing fraudulent inducement to be

---

[5] Notably, Werwinski has been the subject of criticism from lower state courts, see, e.g., Smith v. Reinhart Ford, No. CIV.A.03-03183, 2004 WL 3092495 (Pa. Com. Pl. Sept. 29, 2004), and some district courts. See O'Keefe v. Mercedes-Benz, USA, LLC, 214 F.R.D. 266, 278 (E.D. Pa. 2003) (expressly disagreeing with Werwinski and finding the doctrine inapplicable to UTPCPL claims); McElwee Group, LLC v. Municipal Authority of Borough of Elverson, 476 F. Supp. 2d 472, 477 (E.D. Pa. 2007) (finding doctrine inapplicable to intentional fraud claim falling within Bilt-Rite exception). Absent contrary authority from the Third Circuit or Pennsylvania Supreme Court, however, this Court is bound to the holding in Werwinski. DeFebo v. Andersen Windows, Inc., 654 F. Supp. 2d 285, 294 (E.D. Pa. 2009) (citing Mansmann v. Tuman, 970 F. Supp. 389, 402 (E.D. Pa. 1997) ("The Third Circuit's interpretation of Pennsylvania law is binding on the district court. . . ."); Cohen v. Am. Int'l Ins. Co., No. CIV.A.95-5243, 1996 WL 103793, at *3 (E.D. Pa. Mar. 7, 1996) (stating that a Third Circuit opinion is binding on the district court in the absence of a contradictory decision from the Pennsylvania Supreme Court, and that the Third Circuit's prediction need not follow decisions by the intermediate state courts); Superior Precast, Inc. v. Safeco Ins. Co. of Am., 71 F. Supp. 2d 438, 449 (E.D. Pa. 1999) (stating that the "conclusions of other courts [i]n this district are not binding on this court").

separate and distinct from the breach of contract to avoid application of the doctrine). Such an exception does not apply to Plaintiff's claim, as courts have found that fraudulent representations concerning a party's performance of a contract are interwoven with the terms of the contract. See, e.g., Freedom Properties, L.P. v. Lansdale Warehouse Co. Inc., No. CIV.A.06-5469, 2007 WL 2254422, at *7 (E.D. Pa. Aug. 7, 2007) (applying doctrine to preclude fraudulent inducement claim where fraud allegations were based "solely on a failure to perform in accordance with express contractual terms"); Reilly Foam Corp. v. Rubbermaid Corp., 206 F. Supp. 2d 643, 659 (E.D. Pa. 2002) ("Inducement claims remain viable only when a party makes a representation extraneous to the contract, but not when the representations concern the subject matter of the contract or the party's performance.") (quoting Werwinski, 286 F.3d at 678).

Applying Werwinksi, the Court finds that the economic loss doctrine bars Plaintiff's UTPCPL claim. Similar to Werwinski, Plaintiff's claim is "undergirded by factual allegations identical to those supporting [Plaintiff's] breach of contract counts" and "did not cause harm to the [P]laintiff[] distinct from those caused by the breach of contract." Werwinski, 286 F.3d at 678 (quoting Pub. Serv. Enter. Grp., Inc. v. Phila. Elec. Co., 722 F. Supp. 184, 201 (D.N.J. 1989)). As such, the Court grants Defendants' motion to dismiss the claim.

## IV. CONCLUSION

Based on the foregoing, the Court grants Defendants' Motion to Dismiss Plaintiff's civil conspiracy action (Count III) for failure to state a claim, and Plaintiff's UTPCPL claim (Count V) pursuant to the economic loss doctrine. The Court denies Defendants' Motion with respect to Plaintiff's claim for tortious interference with a prospective economic relationship (Count VI).

An appropriate Order follows.